# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Snowden*, 2011 IL App (1st) 092117

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEONTE SNOWDEN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1–09–2117 |
| Filed | June 10, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder under an accountability theory was proper where a rational trier of fact could have found defendant guilty where defendant "solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission" of a burglary and home invasion of the victim's apartment and as part of the common design the principal killed the victim in furtherance of the offense. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05–CR–18551; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Tomas G. Gonzalez, all of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Sheilah O'Grady, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. Presiding Justice Garcia and Justice Cahill concurred in the judgment and opinion. |

## OPINION

¶ 1    Following a jury trial, defendant Deonte Snowden was convicted under an accountability theory of the first degree murder of Jataun Jennings. The trial court subsequently sentenced him to 27 years in prison. Defendant appeals, arguing that: (1) the State failed to prove him guilty beyond a reasonable doubt of murder where the actual killer remains unknown; (2) defendant was denied the effective assistance of trial counsel because his trial counsel failed to litigate a motion to quash arrest and suppress statements; (3) the trial court erred in giving a jury instruction that a person who is legally responsible for the conduct of another may be convicted even though the other person is "not amenable to justice"; (4) the trial court abused its discretion in sentencing defendant to an excessive term in prison in light of his age and lack of criminal background; and (5) the trial court failed to comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)).

¶ 2    The following evidence was presented at defendant's April 2009 jury trial.

¶ 3    Sheena Heard testified that she was Jataun Jennings' sister. She stated that Jennings lived at 1114 East 73rd Street in Chicago with her two-year-old son. On the night of July 11, 2005, she spoke with Jennings on the phone three times about an interview Jennings had the next day.

¶ 4    Officer Tamica Rainey testified that on July 12, 2005, she was assigned to the third district of the Chicago police department. The third district encompasses the southeast side of Chicago. Officer Rainey was working with a partner, was in uniform and driving a marked patrol car.

¶ 5    At approximately 3:35 a.m., Officer Rainey received a call about a person who had been stabbed. She then proceeded to 1114 East 73rd Street. When she arrived, she went up the stairs to the first level of apartments. Officer Rainey noticed blood on the carpeting of the

stairs and along the wall as well as on the apartment door to the right. She saw Jennings to her left, lying on the stairs to the second level. Officer Rainey observed that Jennings had been stabbed multiple times and was covered in blood. She immediately radioed for an ambulance to come to the scene. Jennings was transported to Stroger Hospital. Officer Rainey saw stab wounds to the left side of Jennings' neck to her thighs and defensive wounds on her forearms.

¶ 6		Officer Rainey spoke with Jennings very briefly. Officer Rainey asked Jennings who did this to her and Jennings replied that she did not know. Jennings then asked the officer to get her baby. Officer Rainey asked where the baby was and then went upstairs. Officer Rainey went into apartment 2W and saw blood throughout the entire apartment, but did not see the baby. She went across the hall, where she saw blood on the wall and the door. She knocked on the door and the tenant in that apartment had the child. When Officer Rainey walked through Jennings' apartment, she observed a knife at the opening of the bedroom door. She notified her sergeant and an evidence technician was called. Officer Rainey had no further involvement in the case after that night and the case was turned over to the detectives.

¶ 7		Detective Pat Hackett testified that on July 12, 2005, he was on duty as a detective with his partner, Detective Paul Alfini, when he received an assignment to go to 1114 East 73rd Street. When he arrived at that location, he went to the second floor. He observed droplets of blood in the first-floor hallway leading up the stairs to the second floor. When he entered Jennings' apartment, he saw a "horrific amount of blood on the floor." He noticed bloody handprints and barefoot bloody footprints on the floor. He observed a knife next to the side of the bed on the bedroom floor. He described the knife as "a basic kitchen knife[,] *** a sharp carving knife." He saw a matching knife in the kitchen and the knives appeared to be a set. He testified on cross-examination that he did not see any signs of forced entry.

¶ 8		Jennings had already been transported to Stroger Hospital when Detective Hackett arrived. He was present when the evidence technician was on the scene and directed him to take photographs and collect the knife. Later, Detective Hackett went to the hospital to look for the victim, but was informed that she had been taken directly to surgery. He returned to Area 2 headquarters around 6 a.m. He later spoke with a doctor who informed him that Jennings had passed away. When his shift ended, Detective Hackett passed the case on to Detectives Durkin, Almazan and Fassl.

¶ 9		The next day on July 13, 2005, Detective Hackett continued to investigate Jennings' homicide. He learned from other detectives that they had a person named Norman Shipp at the police station. He also found out Shipp's address, 7126 South Woodlawn. He then looked at a map and traced the route from Jennings' apartment at 1114 East 73rd to Shipp's address at 71st and Woodlawn. It was approximately two blocks. They went to the scene and walked the alleys between the two addresses. Detective Hackett testified that he found a gray, hooded sweatshirt at the bottom of a garbage can, located at 7241 South University. The sweatshirt had blood on it. He called an evidence technician to recover the sweatshirt.

¶ 10		Officer Robert Williams testified that he is employed as an evidence technician with the Chicago police department. He stated that on July 13, 2005, he received a call to take photographs and recover property in the alley near 7241 South University. He took

photographs and recovered the gray sweatshirt Detective Hackett had found in a garbage can. He entered the sweatshirt into inventory.

¶ 11 Jennifer Palisoc testified that she is employed by AT&T as a sales program execution analyst. She reviewed the cell phone subscriber information for phone number 773-841-6077. She stated that the subscriber for that number was Jataun Jennings. Palisoc testified that the phone records show all incoming and outgoing calls from July 11, 2005, to July 13, 2005.

¶ 12 On July 11, the records reflect three phone calls were made to 773-392-4120 between 10:30 and 10:45 p.m. The next time the phone number was used was at 3:49 a.m. on July 12, to call the voicemail. The phone was used again at 3:52 a.m. and a call was placed to 773-330-5515. The subscriber for this account is Norman Shipp. That number was also called at 12:51 p.m. on July 12. The phone was used throughout the day of July 12.

¶ 13 Palisoc also testified about the subscriber identity module (SIM) card for Jennings' phone. The SIM card communicates with the network and is how one is able to make a phone call on the network. Palisoc stated that it is simple to replace a SIM card.

¶ 14 Palisoc further testified about the equipment history for Jennings' SIM card and phone. It indicated that Jennings' SIM card was used from 2:43 p.m. on July 12, 2005, to 9:07 p.m. on July 13, 2005, in an LG C1300 phone. The same phone equipment used a SIM card registered to Norman Shipp from 11:36 p.m. on July 11, 2005, to 10:46 a.m. on July 12, 2005. Palisoc also testified about two other cell phones that had been used with Jennings' SIM card prior to July 12, 2005.

¶ 15 Detective Patrick Durkin testified that he was assigned to Jennings' homicide shortly after 8 a.m. on July 12, 2005. He worked with two partners, Detectives Alejandro Alamazan and John Fassl. They went to 1114 East 73rd Street to follow up on the homicide. He noted there was a lot of blood in the apartment. He called a forensic investigator to collect additional evidence. He asked the investigator to pay special attention to the rear window off the porch. He did so because in his survey of the crime scene, he noticed the window was ajar and the glass was raised up, but the dust on the window sill had not been disturbed. He stated that it was likely a person could reach through this window and unlock the rear door from the inside.

¶ 16 Detective Durkin later met with Jennings' family. He learned that Jennings had a cell phone, but it was not in her apartment after her murder. He also found out Jennings' phone number and received information to access Jennings' Cingular account. He discovered that her phone number had been used after she had died. He followed up on the phone numbers called from Jennings' account. He found out that one of the phone numbers was registered to Norman Shipp and another dialed number was registered to Priscilla Cook. Following a conversation with Cook, Detective Durkin went to 71st and Woodlawn and met with Norman Shipp, Sr. He then went to 71st and University and met with Norman Shipp, Jr. Shipp, Jr., was taken back to Area 2.

¶ 17 Detective Alejandro Almazan testified that he is a detective with the Chicago police department and was assigned to investigate Jennings' homicide with Detectives Durkin and Fassl. As part of his investigation, he reviewed Jennings' phone records.

¶ 18     One of the phone numbers called from Jennings' phone number belonged to Danielle Jackson. He went to her residence and spoke with her grandmother. Jackson arrived home a short time later. He asked to see Jackson's cell phone, which she gave him. He observed that her phone number matched one of the dialed calls made after Jennings' death. Detective Almazan asked her to call that number, which she did. Jackson had a conversation with the person and afterward, they went to 71st and Woodlawn. They were looking for a young man by the name of "Donte" or "Tay." He was a black male, around 15, 16 years old.

¶ 19     They arrived at that location at around 5 p.m. Detective Almazan observed several young black males on the corner. He exited the vehicle to do a field interview. He identified defendant in court as the young man he approached. He asked defendant his name and he responded that it was Deonte Snowden. The detective asked if defendant was in possession of anything and defendant produced a Cingular LG flip phone. Defendant was with Tyree Bell and the officers recovered two additional phones from Bell. Both men were transported to Area 2. They were kept in separate areas at the station. The detectives contacted their parents.

¶ 20     The detectives questioned defendant. Defendant was asked how he was in possession of the telephone. Defendant responded that the phone belonged to him. The detectives asked him how the phone was operating with Jennings' phone number. Defendant stated that on July 11, 2005, sometime after 11 p.m., he asked to borrow the phone of Prentice Shipp. When Prentice was not looking, he took the SIM card out of Prentice's phone and put it in his phone. Prentice is Norman Shipp's brother.

¶ 21     Defendant's mother, Angela Walker, arrived at the police station and spoke privately with defendant. Afterward, Detective Almazan along with Detective Fassl had a second conversation with defendant. Defendant told them that on July 10, 2005, he and a friend named Corey Manuel spent the night at Tyree Bell's apartment. Bell lived across the hall from Jennings.

¶ 22     On the morning of July 11, defendant and Manuel were the only ones in the apartment and they decided to clean up a little. They took the garbage out to the dumpster. When they returned to Bell's apartment, Manuel pointed out to defendant that Jennings' back door was open. They entered the apartment. Detective Almazan testified that he stopped the conversation at that point and read defendant his *Miranda* warnings.

¶ 23     Defendant agreed to continue the conversation. He stated that when they entered the apartment, they saw two cell phones and a cell phone charger on the kitchen counter. He took one of the phones, which did not work, and Manuel took the second phone and the charger. They left the apartment and returned to Bell's apartment. Defendant said he left the cell phone at Bell's and returned around 11 p.m. that night to recover it. He said he then spent the night at the house of a friend named Marcellus. The interview ended at that time. Defendant's mother left and the detectives followed up on the investigation based upon the information from defendant.

¶ 24     The next morning, July 14, 2005, at approximately 5 a.m., Detective Almazan spoke with defendant's mother. She stated that she could return around 6 a.m., but she still had not arrived by 11:40 a.m. The detectives had a third conversation with defendant. A youth officer

was present during the interview. Detective Almazan stated that he again advised defendant of his *Miranda* rights, which defendant waived, and agreed to speak with them.

¶ 25    Defendant started to tell the same story, but the detectives told him he was not being truthful about how he got Jennings' SIM card because the phone records indicated that Jennings used the phone after the time defendant said he was in her apartment.

¶ 26    Defendant then changed his story. He stated that Manuel went into the apartment first and he followed. He went through the entire apartment. He said there was one cell phone and a charger on the kitchen counter. He took the phone and Manuel took the charger. Before they could take anything else, defendant heard his name being called outside by a friend named Lester Owens. They left Jennings' apartment and closed the back door.

¶ 27    Later, defendant went to 72nd and Woodlawn. He met three men there, Norman Shipp and two others. He stated that he told them he knew of a place where "there was a lick." Defendant told the detectives that "a lick" was "somewhere that was easy to rob or burglarize." Shipp asked where "the lick" was. Defendant told him it was across the hall from Sherita Myles' apartment, which was Jennings' apartment. Myles is Bell's mother. Shipp asked defendant what time they wanted to "do the lick," and defendant said he told Shipp he did not want to be there when it happened. Defendant said he told Shipp to go in through the back door because it would be open.

¶ 28    Defendant stated he left and spent the night at Marcellus' house with Owens. He woke up around 11 a.m. on July 12, 2005, and walked to 72nd and Woodlawn with Owens. Defendant saw Myles there and she told them her neighbor had been stabbed that night. Defendant told them he walked over to 71st and Woodlawn and saw Shipp. He asked Shipp what he got from "the lick." Shipp told defendant he got a DVD player and a cell phone. Defendant asked for the cell phone, which Shipp gave him. Defendant switched his SIM card to the phone Shipp took from Jennings' apartment. After this conversation, Detective Almazan continued his investigation.

¶ 29    Detective John Fassl testified that he is a detective with the Chicago police department and was assigned to investigate Jennings' murder on July 12, 2005, with Detectives Durkin and Almazan.

¶ 30    On July 14, 2005, defendant's father, Lamont Snowden, arrived at Area 2 and spoke privately with defendant. Shortly thereafter, defendant agreed to give another statement to Detective Fassl with his father present. Detective Fassl read defendant his *Miranda* rights, which defendant acknowledged and waived. Detective Fassl told defendant that the detectives did not believe he was being truthful to them and the detectives believed defendant's involvement was more than he had stated.

¶ 31    Defendant again recounted that he spent the night at Bell's apartment on July 10, and he and Manuel were outside the building when they saw Jennings leave with her child and drive away in a green car. After they cleaned the apartment and took out trash, they saw the back window to Jennings' apartment was open. Defendant stated that Manuel said, " 'Let's see if we can get in the apartment.' " Manuel entered first through the back door, which was open. They walked around the apartment and defendant took a cell phone. Manuel took a second phone and a charger.

¶ 32    Later, defendant went to Rob's Liquor Store at 71st and Woodlawn. While there, he ran into a person he knew from the neighborhood as "Rico." Defendant said Rico was "a burglar and a stickup man from the area." Defendant told Rico where an "easy lick" was. Rico asked defendant how he knew that and defendant told him that he had been in the apartment. Rico asked defendant when he wanted to do it. Defendant told Rico that he did not want to go into the apartment, but would act as a lookout.

¶ 33    Defendant said he gave Rico his cell phone number and told Rico to call him to decide when to do the burglary of Jennings' apartment. The phone number defendant gave Rico was registered to Shipp because defendant said he had switched his SIM card with the SIM card in Prentice's cell phone. At about 2 a.m. on July 12, 2005, he received a call from Rico, asking defendant to meet him at 73rd and Woodlawn. Defendant met with Rico. Defendant stated that Rico was wearing a dark, hooded sweatshirt, dark pants, and black and red Timberland boots.

¶ 34    Defendant and Rico walked westbound on 73rd Street until they reached the alley west of Jennings' apartment building. They turned north in the alley and reached the building. Defendant pointed out Jennings' apartment to Rico. Defendant said that Rico walked down the gangway while he went to the front of 1114 East 73rd. Defendant stated that he did not see how Rico entered Jennings' apartment.

¶ 35    Defendant told the detective that he had been sitting on the stoop for about 15 minutes when he heard a woman screaming. He got up and was going to run westbound, but ran into Rico, who was carrying a black bag. Both men ran eastbound on 73rd. They crossed University and Rico ran northbound into an alley and defendant continued eastbound. A few minutes later, defendant received a call on his cell phone from a number he did not recognize and he ignored the call. Detective Fassl testified that the number from the call was from Jennings' cell phone.

¶ 36    Defendant said he went to his friend Marcellus' house and spent the night. When he awoke that morning, he walked back over to 1114 East 73rd and saw Myles. Myles told him that her neighbor had been stabbed and killed. Defendant received another call from Jennings' cell phone number, which he answered, and it was Rico. He met with Rico and asked what Rico got from the apartment. Rico told him he got a DVD player and a cell phone. Defendant asked Rico what happened since he knew Jennings had been killed. Defendant said Rico told him that Jennings woke up while he was there and because she saw his face, he stabbed her. Defendant asked Rico for some proceeds from the burglary. Rico gave defendant the phone, which defendant started to use. He switched the SIM card from Jennings' phone into his cell phone.

¶ 37    After this conversation, Detective Fassl contacted the Cook County State's Attorney's office felony review unit. An assistant State's Attorney (ASA) named Bryan Hofeld came to Area 2. He spoke with ASA Hofeld. ASA Hofeld spoke with defendant and his father. Detective Fassl was present when ASA Hofeld advised defendant of his rights and defendant agreed to speak with him. Defendant then related essentially the same statement as he had given to Detective Fassl. Defendant then agreed to give a videotaped statement to ASA Hofeld. Detective Fassl was present when defendant, his father, ASA Hofeld, and Fassl

signed the consent to videotaped statement form.

¶ 38    ASA Bryan Hofeld testified that in July 2005, he was employed by the Cook County State's Attorney's office and assigned to the felony review unit. He received an assignment at approximately 7:45 p.m. on July 14, 2005, to go to Area 2 in connection to the break-in and stabbing death of Jennings on July 12, 2005.

¶ 39    Once at the police station, he spoke with Detective Fassl and then with defendant and his father. ASA Hofeld identified defendant in court. He learned that defendant was 15 years old at that time. The first thing he did was advise defendant that he was a prosecutor and not defendant's attorney. He also advised defendant of his *Miranda* rights and he had defendant explain each of the rights to make sure defendant understood those rights. He then had a conversation with defendant about the crime. Defendant repeated the same version of events that he had previously given to Detective Fassl.

¶ 40    After this conversation, ASA Hofeld asked defendant if he would be willing to memorialize his statement. Defendant agreed to give a videotaped statement and signed the written consent form, which was also signed by his father, ASA Hofeld, and Detective Fassl.

¶ 41    At the beginning of the videotaped statement, ASA Hofeld stated that defendant would be charged as an adult. At that point, defendant's father interjected and asked when had they decided to charge defendant as an adult. Defendant's father said that ASA Hofeld previously told him they were not sure whether defendant would be charged as an adult. Defendant also expressed confusion over this issue. ASA Hofeld clarified that maybe he misspoke or was not clear, but "because of the nature of the allegation of the incident, because [defendant was] 15 years old, [he] would be charged as an adult." ASA Hofeld again advised defendant of his *Miranda* rights. Defendant then recounted the same version as he had given to Detective Fassl that night. On cross-examination, ASA Hofeld stated that Rico's full name was Nerico James.

¶ 42    Danielle Jackson testified that on July 13, 2005, she received a call from her grandmother asking her to return home. When she got home, three detectives were at her house. They asked to see her cell phone and if she had spoken with anyone that morning. She stated that she had talked with a boy named "Tey." The officers asked her to call "Tey," which she did. She described him to the detectives as dark skinned and around 14 or 15 years old.

¶ 43    Officer James Bartkowiak testified that he is employed as an evidence technician with the Chicago police department. On July 12, 2005, Officer Bartkowiak received an assignment to go to 1114 East 73rd Street. He went to the apartment building at that location and was directed to apartment 2W. He observed the scene and saw blood in various rooms of the apartment as well as a knife. He took photographs of the inside of the apartment and collected the knife from the bedroom, which was issued an inventory number. Officer Bartkowiak described the knife as a kitchen knife and the knife had blood on it when he collected it.

¶ 44    Officer Raymond Jaster testified that he is employed as a forensic investigator with the Chicago police department. Prior to that position, Officer Jaster had worked as a patrol officer, a detective and an evidence technician. He received an assignment at around 9 a.m. on July 12, 2005, to go to Stroger Hospital. Jennings had died from her wounds and Officer

Jaster was sent to bag her hands to preserve evidence that might be underneath her fingernails.

¶ 45    Officer Jaster then went to 1114 East 73rd Street. He went to an apartment on the second floor and met with the detectives. He was asked to take photographs of the exterior of the building and both the front and rear doors to the apartment. He also took photographs of the interior of the apartment. Officer Jaster also took blood standards and examined the apartment doors for ridge impressions.

¶ 46    Officer Jaster stated that the apartment was sparsely furnished. He observed a lot of blood in the apartment and saw a bloody handprint under a light switch in the dining room. He described pools of blood in the kitchen and the bedroom. He also collected five fingerprint lifts. Three were from the interior of the rear door near the lock, one from the interior of the storm window, and one from the interior of the front door near the lock. Officer Jaster collected multiple blood swabs, including swabs from the kitchen floor, the pool of blood in the bedroom, the interior of the front door, and the bloody handprint.

¶ 47    Moira McEldowney testified that she is a forensic scientist with the Illinois State Police crime lab. She received the fingerprint lifts from Jennings' apartment for analysis, but determined that the fingerprints were not suitable for comparison.

¶ 48    Jennifer Bell testified that she is employed as a forensic scientist with the Illinois State Police crime lab as an expert in forensic DNA. She stated that she analyzed blood swabs from the crime scene and the gray sweatshirt. She also collected cellular material from the neck and cuffs of the sweatshirt. She had received DNA standards from defendant, Jennings, and Nerico Jones. The bloodstains on the sweatshirt were discovered to be a mixture of two people's DNA, a female and a male. One stain could not exclude Jennings as a match. The cellular material was a match to a human male. In Bell's expert opinion, it was Jennings' blood on the sweatshirt. However, both defendant and Jones were excluded as possible sources of the male DNA.

¶ 49    The parties entered into a stipulation from Wendy Levezzi, a medical examiner with the Cook County medical examiner's office. If called to testify, Dr. Levezzi would have presented testimony about Jennings' autopsy. The stipulation stated that Jennings sustained 17 stab wounds, including wounds to her head, neck, and chest. Dr. Levezzi would have testified that within a reasonable degree of medical and forensic certainty the cause of death was multiple stab and incised wounds and the manner of death was homicide.

¶ 50    The State rested after this stipulation. The defense rested without presenting any evidence. During the jury instruction conference, the State offered Illinois Pattern Jury Instructions, Criminal, No. 5.06 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 5.06), which stated, "A person who is legally responsible for the conduct of another may be convicted for the offense committed by the other person even though the other person, who it is claimed committed the offense, is not amenable to justice." The defense objected to this instruction "[b]ecause of the term legally responsible," but voiced no other objection. The instruction was given to the jury over defense counsel's objection.

¶ 51    During deliberations, the jury sent out a note, asking "Can we find the defendant legally responsible for the conduct of the stabber if we are not certain who the stabber was?" Over

an objection by defense counsel, the trial judge responded to the jury note with the word "yes." Defense counsel then moved for a mistrial, which the trial judge denied. Following deliberations, the jury found defendant guilty of first degree murder.

¶ 52    Defendant filed a motion for a new trial, which was denied. At the subsequent sentencing hearing, the State argued in aggravation about the brutality of the crime and presented letters from Jennings' family members. In mitigation, defense counsel submitted defendant's school records and achievements, including a book defendant had written. Defense counsel also noted defendant's lack of a criminal background. After considering all factors in aggravation and mitigation, the trial court sentenced defendant to a term of 27 years in prison.

¶ 53    This appeal follows.

¶ 54    Defendant first argues that the State failed to prove him guilty of first degree murder under an accountability theory because the State did not prove that defendant shared a common criminal design with the principal who killed Jennings since the identity of the principal was never established. The State maintains that it was not required to prove who actually killed Jennings, but instead had to prove the elements of the offense, that defendant, or someone for whom he was legally responsible caused Jennings' death, either directly or during the commission of a felony.

¶ 55    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

¶ 56    The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280. However, the fact a judge or jury did accept testimony does not guarantee it was reasonable to do so. Reasonable people may on occasion act unreasonably. Therefore, the fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. *Cunningham*, 212 Ill. 2d at 280. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

¶ 57    Defendant contends that the State failed to prove him guilty of Jennings' murder because the identity of the principal was not proven. According to defendant, he cannot be legally accountable for an unknown person's criminal acts and his conviction must be reversed. The State responds that it had to prove (1) defendant, or one for whose conduct he was legally responsible, performed acts which caused Jennings' death, and that (2) defendant, or one for

whose conduct he was legally responsible, intended to kill Jennings or do her great bodily harm, or knew that his actions would cause her death, or knew that his actions created a strong probability of death or great bodily harm, or was committing the offense of home invasion or residential burglary.

¶ 58     To convict a defendant under the theory of accountability, the State must prove beyond a reasonable doubt that he (1) solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) did so before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5–2(c) (West 2004); *People v. Smith*, 278 Ill. App. 3d 343, 355 (1996). The law on accountability incorporates the "common design rule," which provides that where two or more persons engage in a common criminal design, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts. *People v. Cooper*, 194 Ill. 2d 419, 434-35 (2000).

¶ 59     "Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself." *In re W.C.*, 167 Ill. 2d 307, 338 (1995). "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Cooper*, 194 Ill. 2d at 435. Nevertheless, "mere presence at the scene, even with knowledge that the crime is being committed, is insufficient to establish accountability for the actions of another." *W.C.*, 167 Ill. 2d at 338.

¶ 60     In *Cooper*, the supreme court specifically found that "a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown." *Cooper*, 194 Ill. 2d at 435. In that case, two defendants were found guilty under an accountability theory for aggravated battery with a firearm, even though it was unclear which of the defendants shot the victim. The supreme court affirmed their convictions because the defendants were working in concert as part of a common design. The failure to identify the shooter did not preclude a finding of guilt under the common design theory of accountability. *Cooper*, 194 Ill. 2d at 436.

¶ 61     Similarly, in *People v. Cooks*, 253 Ill. App. 3d 184 (1993), the appellate court affirmed a defendant's conviction for murder under an accountability theory, even though the actual shooter was never identified. In that case, the defendant and several of his fellow gang members pursued rival gang members after a fight. Eventually, the rival gang members were trapped in the vestibule of a tavern. Defendant fired into the vestibule and struck one victim in the leg. Defendant also shot another victim in the head and killed him. During the shooting, "[a]n 'arm' holding a shotgun" fired into the vestibule and shot the first victim in the stomach, killing him. *Cooks*, 253 Ill. App. 3d at 189.

¶ 62     The *Cooks* court found that the evidence sufficiently established that the defendant shared a common design with the co-offender as the defendant facilitated the plan to harm rival gang members. The defendant also aided the unidentified shooter by first shooting the victim in the leg and making him more vulnerable to the subsequent shot. The court further noted

-11-

that the shots were fired as part of a joint action and the defendant did not attempt to intervene or voice opposition to the actions of the co-offender. *Cooks*, 253 Ill. App. 3d at 189-90.

¶ 63        The two cases defendant relies on are distinguishable. In *People v. Garrett*, 401 Ill. App. 3d 238 (2010), the defendant planned a robbery of a Family Dollar store with three other men. The defendant agreed to drive the car and wait outside the store. An officer testified that he was on patrol near the store when an employee got his attention. The officer entered the store and saw two men exit. He " 'believed' " they were carrying guns, but did not see a gun. Another officer pursued the men and located one of them. When she approached, she saw he had a gun in his hand and she ordered him to drop it. The gun was subsequently recovered. The detective investigating the case observed the body of a store employee, who had been shot, in the rear of the store, blocking a bathroom. The detective also testified that he interviewed the store manager and the manager related that no one had demanded or threatened him with a gun for money. An evidence technician testified that he examined the recovered gun, three unfired shell casings and a fired bullet and determined that he " 'could not identify or eliminate' " the fired bullet as having been fired from the recovered gun. *Garrett*, 401 Ill. App. 3d at 239-42.

¶ 64        The defendant was found guilty of felony murder under an accountability theory. On appeal, the reviewing court found that "the jurors could not plausibly find the requisite element of causation by any of the alleged offenders had been proved beyond a reasonable doubt." *Garrett*, 401 Ill. App. 3d at 247. The court noted that though there was evidence placing two members of the group inside the store and one had possession of a gun, "there simply is no evidence suggesting that the gun was the murder weapon or, for that matter, that any weapon was fired contemporaneously with the entry or presence of the defendant's group within the Family Dollar store." *Garrett*, 401 Ill. App. 3d at 247. The *Garrett* court concluded that the evidence established that the defendant shared a common design with those that committed attempted armed robbery, but it was insufficient to prove that the defendant shared a common design with whoever killed the victim. *Garrett*, 401 Ill. App. 3d at 248.

¶ 65        Defendant also cites the decision in *Fagan v. Washington*, 942 F.2d 1155 (7th Cir. 1991), in which the district court concluded that the evidence was insufficient to establish a common design where the victim was shot, but the bullet did not match the defendant's gun or that of his co-offender. In that case, the defendant and fellow gang members went to a location known to be popular with a rival gang. The defendant's group passed the rival gang members and then turned and started shooting. After the shooting ended, two people were wounded and one was dead. However, the evidence at trial showed that the defendant was armed with a .22-caliber rifle and a co-offender had a shotgun, but the victim was killed by .38-caliber pistol. *Fagan*, 942 F.2d at 1156. The court noted that no evidence was presented showing that anyone else was armed. *Fagan*, 942 F.2d at 1159. Additionally, "federal court decisions do not constitute binding precedent upon this court." *I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211, 230 (2010) (citing *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 491 (1988)).

¶ 66        Unlike the evidence presented in *Garrett* and *Fagan*, the evidence at defendant's trial

-12-

established that defendant shared a common design to commit a burglary and home invasion with the principal. The evidence showed that defendant entered Jennings' apartment on July 11 with Manuel. He later approached another individual about the apartment as an easy place to rob. Defendant first told the police that he approached Shipp, but later stated that it was Rico, whose full name is Nerico James. Defendant agreed to serve as a lookout during the burglary and home invasion. He was contacted by Rico and met him before the burglary. While defendant was waiting in front of the building, he heard a woman scream. Before he could run away, he ran into Rico and fled together before splitting to run in different directions. The next day, defendant heard about Jennings' murder. When Rico called defendant, defendant agreed to meet him. At the meeting, defendant asked for proceeds from the burglary. He took possession of Jennings' cell phone and switched the SIM card from her phone into his cell phone. He then used her SIM card to make several calls that day.

¶ 67   Based on this evidence, a rational trier of fact could have found defendant guilty of Jennings' murder under an accountability theory. The evidence established that defendant "solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission" of the burglary and home invasion of Jennings' house and as part of that common design, the principal killed Jennings' in furtherance of the offense. Defendant was the individual who devised the plan to break into Jennings' apartment and approached another person to perform the offense. Defendant willingly accompanied the principal to Jennings' apartment building and shared in the proceeds of the burglary and home invasion. When he was arrested, defendant was in possession of Jennings' SIM card. Defendant was proven guilty beyond a reasonable doubt of murder under an accountability theory.

¶ 68   Next, defendant contends that he received ineffective assistance of trial counsel because his attorney erred in failing to litigate a motion to suppress defendant's statements. The State maintains that defendant cannot establish prejudice because defendant's statement were made voluntarily and the motion would not have been granted.

¶ 69   Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697.

¶ 70   In order to prove ineffective assistance of counsel, defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Giles*, 209 Ill. App. 3d 265, 269 (1991). A decision that involves

a matter of trial strategy will typically not support a claim of ineffective representation. *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003). The question of whether to file a motion to suppress evidence is traditionally considered a matter of trial strategy. *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000). In order to establish prejudice resulting from the failure to file a motion to suppress, a defendant must show that the motion would have been granted and that the trial outcome would have been different if the evidence had been suppressed. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile. *Patterson*, 217 Ill. 2d at 438.

¶ 71     Here, the record indicates that defense counsel filed a motion to suppress defendant's statements, but the motion was never litigated or formally withdrawn. Defendant asserts that the voluntariness of his statements to the police should have been challenged because he was a minor at the time and was questioned initially without a parent present and he had not been given his *Miranda* warnings. He also notes the misunderstanding that arose between ASA Hofeld, his father and himself as to whether defendant would be charged as an adult. According to defendant, these factors suggest that a motion to suppress his statements would have been granted.

¶ 72     "In determining whether a defendant's statements are voluntarily made, a court must look to the totality of the circumstances surrounding the making of the statements." *People v. Armstrong*, 395 Ill. App. 3d 606, 624 (2009) (citing *People v. Brown*, 169 Ill. 2d 132, 144 (1996)). The factors for a court to consider when determining the voluntariness of an inculpatory statement include the defendant's age, education, background, experience, mental capacity, and intelligence, as well as the defendant's physical and emotional condition at the time of questioning, the duration of the questioning, and whether the defendant was subjected to physical or mental abuse by the police. *Armstrong*, 395 Ill. App. 3d at 624.

¶ 73     Defendant cannot satisfy the *Strickland* test. In this case, despite defendant's young age, his statements were voluntary. He received *Miranda* rights at least four times. He was first informed of these rights immediately after he made an inculpatory statement about entering Jennings' apartment on July 11. He then received *Miranda* rights prior to all further statements. ASA Hofeld testified that when he advised defendant of his *Miranda* rights, he made defendant tell him what each of the rights meant to ensure that defendant understood the rights he was waiving. He was able to speak with each of his parents privately before continuing any questioning, and when his mother did not return to the police station, the police had a youth officer present during questioning. Both defendant and his father signed a consent form to give a videotaped statement. Further, the confusion regarding defendant's possible adult charges occurred at the beginning of the videotaped statement. ASA Hofeld discussed this with defendant and his father. He clarified that due to the nature of the crime, if defendant was charged, it would be as an adult. This confusion was cleared up before defendant gave his videotaped statement. Additionally, ASA Hofeld asked defendant outside the presence of police officers and while his father was present if he had been treated well at the police station and defendant said he had and made no complaints.

¶ 74     Given the circumstances of defendant's statements, it is unlikely that the motion to suppress would have been granted. The record supports the voluntary nature of his

-14-

statements. Defendant was advised of his *Miranda* rights more than once and was asked to explain the rights to demonstrate his understanding. He was able to speak privately with his parents before continuing questioning and his parents or a youth officer was present during questioning. Defense counsel's decision not to litigate the motion to suppress was a matter of trial strategy and defendant cannot show the motion had a reasonable likelihood of success. Accordingly, defendant failed to establish that his attorney's performance was deficient.

¶ 75     Defendant next argues that the trial court erred in instructing the jury as to the legal definition of accountability. IPI Criminal 4th No. 5.06 states:

> "A person who is legally responsible for the conduct of another may be convicted for the offense committed by the other person even though the other person, who it is claimed committed the offense, [(has not been prosecuted) (has not been convicted) (has been convicted of a different offense) (is not amenable to justice) (has been acquitted)]." IPI Criminal 4th No. 5.06.

¶ 76     Here, the version of IPI Criminal 4th No. 5.06 given to the jury included the phrase "is not amenable to justice." Defendant contends that this phrase in the instruction was error and the instruction should have stated that the offender "has not been prosecuted." Though defense counsel objected to this instruction at trial, the specific objection was over the phrase "legally responsible" and no objection was raised as to the use of "is not amenable to justice."

¶ 77     "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Herron*, 215 Ill. 2d 167, 175 (2005). Defendant asks this court to review this issue as plain error. Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

¶ 78      Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that the first prong applies in this case because the evidence was closely balanced. However, "[t]he first step of plain-error review is to determine whether any error occurred." *Lewis*, 234 Ill. 2d at 43. We review the issue to determine if there was any error before considering it under plain error.

¶ 79     Further, Supreme Court Rule 451(c) "provides that 'substantial defects' in criminal jury instructions 'are not waived by failure to make timely objections thereto if the interests of justice require.' " *Herron*, 215 Ill. 2d at 175 (quoting Ill. S. Ct. R. 451(c) (eff. July 1, 1997)).

-15-

"Rule 451(c) crafts a limited exception to the general rule to correct 'grave errors' and errors in cases 'so factually close that fundamental fairness requires that the jury be properly instructed.' " *Herron*, 215 Ill. 2d at 175 (quoting *People v. Hopp*, 209 Ill. 2d 1, 7 (2004)). "Rule 451(c) is coextensive with the 'plain error' clause of Supreme Court Rule 615(a), and we construe these rules 'identically.' " *Herron*, 215 Ill. 2d at 175 (quoting *People v. Armstrong*, 183 Ill. 2d 130, 151 n.3 (1998)).

¶ 80    "The function of jury instructions is to convey to the jury the law that applies to the evidence presented." *Herron*, 215 Ill. 2d at 187. "Jury instructions should not be misleading or confusing [citation], but their correctness depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them [citation]." *Herron*, 215 Ill. 2d at 187-88. We recognize that the supreme court has held that "a jury instruction error rises to the level of plain error only when it 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " *Herron*, 215 Ill. 2d at 193 (quoting *Hopp*, 209 Ill. 2d at 8). "The general rule is that 'some evidence' must be presented to justify giving a jury instruction." *People v. Adams*, 394 Ill. App. 3d 217, 231 (2009) (quoting *People v. Mohr*, 228 Ill. 2d 53, 65 (2008)).

¶ 81    Defendant contends that the phrase "is not amenable to justice" misled the jury into believing that defendant "was the only person at the time of trial who could be held responsible in any way for Jennings' death." Rather, defendant asserts that the State has "simply" chosen not to prosecute Rico and the jury should have been properly instructed. Defendant notes that "Black's Law Dictionary defines 'amenable' as 'subject to answer to the law.' Black's Law Dictionary, 5th ed. p. 74." However, a more recent addition of Black's Law Dictionary defines "amenable" as "[l]egally answerable; liable to being brought to judgment." Black's Law Dictionary 80 (7th ed. 1999).

¶ 82    Defendant cites the decision in *People v. Spain*, 285 Ill. App. 3d 228 (1996), as support. In *Spain*, the reviewing court reversed and remanded for a new trial on a different issue, but considered this issue as it was likely to recur on remand. There, the identity of the co-offender was established and the trial judge stated that it did not know if the co-offender was amenable to justice. The *Spain* court held that the trial court should not include the "is not amenable to justice" portion of the instruction unless there is evidence to support it. *Spain*, 285 Ill. App. 3d at 238.

¶ 83    Here, the evidence presented two possible co-offenders, Nerico James and Norman Shipp. Both were implicated at some point by defendant. James' DNA was tested against the cellular material from the sweatshirt and was eliminated. Shipp's DNA was not tested. The evidence was not clear as to the identity of the co-offender. Put another way, the evidence did not establish who was "legally answerable" for the crime and as we have already found, the State was not required to prove the identity of the individual who actually stabbed Jennings. Further, "the State's opinion of the strength of its case against one offender is completely irrelevant to the jury's determination of the guilt or innocence of another offender." *People v. Walker*, 392 Ill. App. 3d 277, 292 (2009).

¶ 84    Given the facts of this case, the language "is not amenable to justice" was appropriate

where the principal remained unidentified at trial. Defendant's argument that the trial court should have used "has not been prosecuted" is unavailing because the evidence did not conclusively show who killed Jennings so there was no one else to prosecute. Moreover, defendant has not shown how the difference changed the jury's determination in the case as under either option the jury was informed that a person who was legally responsible for the conduct of another could be convicted of an offense committed by the other person, regardless of the legal status of the other person. The jury knew it was deliberating defendant's guilt separate from the principal. The jury instruction as given was supported by evidence at trial and the trial court did not err. Since we conclude that there was no error, there cannot be plain error.

¶ 85    Next, defendant asserts that the trial court abused its discretion in sentencing defendant to a 27-year term in prison because defendant was 15 years old at the time of the offense, he was not inside Jennings' apartment when she was stabbed, and this was his first conviction. The State maintains that the sentence was not excessive and responds that defendant has forfeited this issue by failing to file a motion to reconsider sentence. To preserve a sentencing issue for appellate review, a defendant must raise the issue with the trial court in a postsentencing motion. *People v. Reed*, 177 Ill. 2d 389, 393 (1997). Defendant asks this court to review the issue under the second prong of the plain error rule because the right to be lawfully sentenced is a substantial right. But first we must determine whether there was any error, let alone a plain error.

¶ 86    "It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant." *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). "An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is in a better position to decide the appropriate sentence." *Evans*, 373 Ill. App. 3d at 967. "Accordingly, a trial court's sentencing decision is not overturned absent an abuse of discretion." *Evans*, 373 Ill. App. 3d at 967.

¶ 87    "The Illinois Constitution mandates the balancing of both retributive and rehabilitative purposes of punishment." *Evans*, 373 Ill. App. 3d at 967; see also Ill. Const. 1970, art. I, § 11. "The trial court is therefore required to consider both the seriousness of the offense and the likelihood of restoring the offender to useful citizenship." *Evans*, 373 Ill. App. 3d at 967. However, "[a] trial court is not required to give greater weight to the rehabilitative potential of a defendant than to the seriousness of the offense." *People v. Govea*, 299 Ill. App. 3d 76, 91 (1998). "In determining an appropriate sentence, the trial judge is further required to consider all factors in aggravation and mitigation, which includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime." *Evans*, 373 Ill. App. 3d at 967. "Generally, the trial court is in a better position than a court of review to determine an appropriate sentence considering the particular facts and circumstances of each individual case." *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007). "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation that is before it." *People v. Bowman*, 357 Ill. App. 3d 290, 303 (2005). "If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or

is manifestly disproportionate to the nature of the offense." *Starnes*, 374 Ill. App. 3d at 143 (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 88    The trial court sentenced defendant for one count of first degree murder. The sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5–8–1(a)(1)(a) (West 2008).[1] The trial court imposed a sentence of 27 years, which was within the applicable sentencing range. Nevertheless, defendant argues that the sentence was excessive in light of his age, the mitigating evidence of his school work, his lack of criminal background, and that he was not the individual who stabbed Jennings.

¶ 89    At the sentencing hearing, the trial judge discussed on the record his conclusions in determining defendant's sentence. The judge specifically considered defendant's young age as well as the evidence presented at the hearing and the evidence at trial. The judge also noted that there was "[n]o evidence to suggest that [defendant] was in the apartment when this happened. *** There is evidence to conclude he was in the apartment before it happened and the fact of the matter is it wouldn't have happened but for him." The judge further stated that while the "evidence doesn't show that [defendant] intended for this to happen to Ms. Jennings," defendant "has to be held responsible for Ms. Jennings' death consistent with the jury's verdict."

¶ 90    Based on the entire record before us and given the nature of the crime and defendant's role in facilitating the burglary that led to Jennings' death, we do not find that the trial court abused its discretion. Defendant received a sentence on the low end of the sentencing range, only 7 years over the minimum and 33 years less than the maximum sentence. The trial court clearly considered all factors in aggravation and mitigation and was especially cognizant of defendant's young age and his level of involvement in the crime when imposing the sentence. Accordingly, we hold that the trial8 court's sentence of 27 years' imprisonment was not an abuse of discretion.

¶ 91    Finally, defendant contends that he was denied a fair trial because the trial court failed to comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)). The State maintains that defendant has forfeited this issue and defendant has not demonstrated that this was plain error. Further, the State responds that the trial court fully complied with Rule 431(b).

¶ 92    Rule 431(b) provides:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

---

[1]Now codified at 730 ILCS 5/5–4.5–20(a) (West 2010).

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 93    Here, it is uncontested that the trial court informed the venire of all four principles and asked them to raise their hands if they will not follow any of them. However, defendant asserts that the court erred by failing to ask if the venire understood the principles. Nevertheless, defendant failed to object to this alleged error at trial nor was it raised in a posttrial motion. As pointed out above, to preserve an issue for review, defendant must both object at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Defendant asks that we review this issue under the plain error rule.

¶ 94    In his reply brief, defendant acknowledges the supreme court's decision in *People v. Thompson*, 238 Ill. 2d 598 (2010). In *Thompson*, the supreme court stated:

"Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607.

¶ 95    Nevertheless, the *Thompson* court held that a trial court's failure to comply with Rule 431(b) is subject to the rule of forfeiture and must be objected to during jury selection and raised in a posttrial motion and that such an error does not constitute plain error under the second prong, absent a showing that a juror was biased. Here, defendant has conceded that he did not object and that there was no indication that the jury was biased. Moreover, based on our discussion of the facts of this case and the entire record before us, we cannot say that the evidence was closely balanced. Therefore, defendant has forfeited his claim of error under Supreme Court Rule 431(b).

¶ 96    Based on the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 97    Affirmed.