FIFTH DIVISION
March 26, 2010

No. 1-08-3499

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 05 CR 08886 |
| | ) | |
| SHAWN GARRETT, | ) | |
| | ) | |
| Defendant-Appellant. | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| | ) | Judge Presiding. |

JUSTICE LAVIN delivered the opinion of the court:

In this case, we consider the appeal of a robbery getaway driver who was convicted of first-degree murder on a theory of accountability after an employee in the targeted store was found shot to death by a gun that was never recovered. Following a jury trial, defendant Shawn Garrett was found guilty and sentenced to 36 years' imprisonment. On appeal, defendant contends that: (1) he was not proven guilty beyond a reasonable doubt; (2) the trial court erred by refusing to suppress his videotaped statement; and (3) his sentence was excessive. Because we ultimately reverse on defendant's contention that he was not proven guilty beyond a reasonable doubt, it is unnecessary for us to address his remaining arguments. We will therefore recite only those facts necessary for our consideration of that single issue.

BACKGROUND

All of the facts of this case occurred on the southeast side of the city of Chicago, where all of the criminal protagonists lived and where the crime scene, a Family Dollar Store, was located.

The victim, Marcel Hunt, was a stock manager at the Family Dollar Store on East 79th Street. He was shot and killed in the store on December 20, 2004. The State sought to prove that Shawn Garrett was guilty of first-degree felony murder under the theory of accountability for his role in the planning of a robbery of the Family Dollar. Garrett was romantically involved with Latonya Dextra, also known as Maria, a woman who worked at the discount store. Dextra's daughter, Dollena, had a boyfriend named Demonte Bolden. Bolden and his brother, Demario had a cousin named Timothy Burton. These three teenagers socialized at Dextra's house, which was located near the Family Dollar. Over the course of several meetings, Garrett and the others discussed various aspects of a planned robbery of the store, enlisting the inside assistance of his girlfriend and utilizing the young men to perform the actual robbery. Garrett himself was to contact the elder Dextra while she was working and determine a convenient time to rob the store, which would occur while Dextra was secreting herself in another part of the store.

According to Dextra's daughter, on December 20, 2004, the Bolden brothers, Garrett and Burton were at her mother's house sitting at a dining room table talking to each other. She did not hear the specific subject matter of the conversation, but Garrett told her that they were "about to go handle some business." Approximately 30 minutes later, defendant returned in his car with Demonte Bolden and told Dollena to go to the Family Dollar to see what was happening. Dollena went to the store, saw that the police and an ambulance were there and then returned home. Dollena testified that she did not see defendant or any of the others with a gun that day.

Officer Tracy Rogers testified that at around 11:30 a.m. on the day of the incident, he happened to be on patrol in the vicinity of the Family Dollar on 79th Street. As he approached

the store, an employee standing outside made a gesture suggesting that something was happening inside the store. Officer Rogers entered the store to investigate and he saw two individuals, at least one of whom he recognized and who were later identified as Burton and Demario Bolden, quickly exit. Officer Rogers followed them outside and called for them to stop. After Officer Rogers addressed the two, they "grabbed their sides and stuff, and then they took off running." Officer Rogers did not actually see any guns at the time, but testified that he "believed" they may have been carrying guns because of the way they grabbed the sides of their pants.

After the two ran, Officer Rogers immediately called for backup and pursued them on foot. During the chase, Officer Rogers lost sight of the two at various times, but at one point he saw Demario Bolden climbing over a fence with a gun in his hand. Officer Rogers momentarily lost sight of him, but after turning a corner, he saw that two other officers had apprehended Demario and that there was a gun on the ground. On cross-examination, Officer Rogers admitted that he never saw defendant Garrett on the day of the incident, saw no illegal conduct occurring in the Family Dollar and heard no gunshots coming from the store.

Officer Theresa Almanza testified that she responded to Officer Rogers' call for assistance and assisted in the pursuit. She obtained a description of an individual to pursue, whom she later learned was Demario Bolden, and eventually located him. As she approached him, she saw a gun in his hand and ordered him to drop it. He complied and was placed into custody by Officer Almanza's partner. During cross-examination, Officer Almanza admitted that she never saw Demario shoot the gun, commit armed robbery or threaten anyone for money.

Officer John Jackson testified that he received a call for assistance from Officer Rogers,

3

prompting him to respond. As he approached the area of the incident, he saw Officer Almanza and other officers placing Demario Bolden into custody. While this was happening, Officer Jackson retrieved and later inventoried the gun. He testified that when he inventoried the gun, he marked it with his initials to allow him to identify it later. During trial, however, Officer Jackson could not find his initials on the gun when he was asked to identify it, although he still believed it was the same gun he had recovered.

Detective John Otto testified that on December 20, 2004, he was assigned to investigate the victim's murder and went to the Family Dollar. While at the store, he proceeded to a storage area in the rear of the store where he saw the victim's body blocking a bathroom that Maria was in. Detective Otto was eventually able to briefly speak with Maria and at that time believed she was a witness. Detective Otto also interviewed Douglas Herd, the manager at the store on the day of the incident, who related that no one had demanded or threatened him with a gun for money.

Little else transpired for the next three months until March 16, 2005, when Burton appeared for a court date on an unrelated matter. Detective Otto learned of this ahead of time and was able to speak with him. After speaking with him, Detectives Otto, Sandoval and Ayers proceeded to a residence located at 8210 South Muskegon Avenue. Detectives Otto and Ayers went to the front of the residence where they spoke with Maria, who agreed to go to the police station.

Detective Sandoval testified that when he arrived at the residence on South Muskegon, he approached the rear of the residence from an alley and saw defendant walking out the back gate.

4

Defendant agreed to accompany Detective Sandoval to the police station, where defendant was arrested and given his Miranda rights. At some point, Detective Sandoval searched defendant and found a note with the word "safe" next to a group of numbers, as well as various names (including Maria's) and other numbers. It was later discovered that the "safe" numbers were codes for a safe at another Family Dollar store where Maria had been transferred after the killing of Marcel Hunt.

During his first conversation with the detectives, defendant denied any involvement in the victim's murder but said that he had heard that Burton and the Bolden brothers had planned to rob the Family Dollar on 79th Street. During a later conversation, defendant again denied any involvement in the victim's murder. Detective Sandoval then informed him that others had implicated him, which provoked defendant to do some soul searching, and during a third conversation with the detective, Garrett allowed that the three teens asked him for a ride to the Family Dollar and that he knew they were going to rob it. He then explained that after he dropped them off, he waited in the parking lot for a time and left with one of the young men who had fled the store and jumped into his car. After this conversation, Assistant State's Attorney Frenzel arrived at the police station and spoke with defendant. During this conversation, Garrett admitted his involvement in the attempted robbery of the Family Dollar and ultimately agreed to give a videotaped statement.

Cid Drisi, a forensic expert in firearm tool mark identification, testified that he received the following items in relation to this case: a gun, three unfired .30-caliber cartridges and a fired bullet. He testified that he "could not identify or eliminate" the fired bullet as having been fired from the inventoried gun.

1-08-3499

Near the end of the State's case-in-chief, defendant's videotaped statement was presented to the jury. In it, defendant stated that he was 25 years old and went to high school through his junior year. He stated that in the months prior to the incident, he, Maria, Burton and the Bolden brothers discussed robbing the Family Dollar on 79th Street on six or seven occasions. The particular store was chosen because Maria worked there. Defendant stated that he was to be the driver and that on the day of the incident, he dropped the three teenage boys off at the Family Dollar. Although he was supposed to remain at the location, he drove away but returned a short while later. Upon returning, he picked up the fleeing Demonte Bolden and left the area. After dropping that Bolden brother off, he claimed that he returned to the Family Dollar and saw that the other brother had been arrested. Defendant did not mention that anyone had a gun or that they had specifically planned to use a weapon.

After the State presented its evidence, defendant made a motion for a directed verdict which was denied. The defense then rested without presenting any witnesses. The jury found defendant guilty of first-degree murder based on a theory of accountability and he was subsequently sentenced to 36 years' imprisonment. This timely appeal followed.

ANALYSIS

On appeal, defendant first contends that the State's evidence did not establish his guilt beyond a reasonable doubt. Given the fact that the State did not offer evidence that proved the identity of the specific person who shot and killed Mr. Hunt, we are constrained to agree that, under this factually and legally insufficient proof, Garrett cannot be criminally accountable for the murder.

6

When a defendant challenges the sufficiency of the evidence to support his conviction, this court must determine, after viewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. People v. Pollock, 202 Ill. 2d 189, 217 (2002). While the weight to be given to the testimony, the credibility of the witnesses, the resolution of conflicting testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact, its determination is nevertheless not conclusive and we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify reasonable doubt of defendant's guilt. People v. Williams, 383 Ill. App. 3d 596, 637 (2008).

In the case at bar, defendant was found guilty of first degree murder under accountability principles. A person is legally accountable for the criminal conduct of another when:

"[B]efore or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 2004).

To show accountability, the State was required to establish beyond a reasonable doubt that: (1) defendant solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the crime; (2) defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. People v. Perez, 189 Ill. 2d 254, 267-68 (2000).

Defendant's first degree murder charge was based on a theory of felony murder. The relevant statute provides as follows: "A person who kills an individual without lawful justification

commits first degree murder if, in performing the acts which cause the death: he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2004). The requisite forcible felony in the prosecution of this case was attempted armed robbery, (a charge that was not put before this jury as a lesser included offense) which requires that a person, while carrying on his person or is otherwise armed with a dangerous weapon, take a substantial step with the intent to take property from another by the use of force or threatening the use of force. 720 ILCS 5/8-4(a), 18-1, 18-2 (West 2004).

Defendant's first argument is that he could not be held accountable for the victim's death because he agreed to a robbery and not an armed robbery. Specifically, he claims that there is no evidence that he used, or agreed to the use of, a dangerous weapon and therefore he did not agree to commit armed robbery. We find this specific argument to be lacking in legal merit, because Illinois law is clear that one can be held accountable for a crime different than the one that was planned. People v. Redmond, 341 Ill. App. 3d 498, 510 (2003). Indeed, the trial court recognized this in the instruction submitted to the jury on accountability:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

This instruction was taken directly from the Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 2000) (hereinafter IPI Criminal 4th), an instruction where the trial court is given the choice to give the instruction based on "the offense" or "an offense." The committee notes on the

instruction explain: "Use the bracketed word 'an' and use the bracketed paragraph when the offense is different than the planned and intended offense, but done in furtherance of it." IPI Criminal 3d No. 5.03, Committee Notes at 106, citing People v. Kessler, 57 Ill. 2d 493 (1974).

The inchoate offense of attempted robbery has two distinct elements: that the offender (1) with the intent to commit a specific offense, (2) does any act which constitutes a substantial step toward the commission of that offense. 720 ILCS 5/8-4(a) (West 2004). The crime of attempt requires a specific intent to commit the named offense. People v. Cruz, 248 Ill. App. 3d 473, 475 (1993).

In the case *sub judice*, count XII of the charging instrument alleged that the five named defendants committed the offense of attempt armed robbery:

"in that they, with intent to commit the offense of armed robbery, did any act, entered the Family Dollar Store located at 2660 East 79th Street, Chicago, Cook County, Illinois while armed with a dangerous weapon, to wit: a firearm, which constituted a substantial step toward the commission of armed robbery."

Although Garrett may not have envisioned that an armed robbery was contemplated, as noted above, that argument is singularly unavailing. Under prevailing principles of legal responsibility, Garrett was accountable for the acts of his coconspirators. Section 5-2 of the Criminal Code of 1961 provides:

"A person is legally accountable for the conduct of another when:

&ast;&ast;&ast;

(c) Either before or during such commission he solicits, aids, abets, agrees or

9

attempts to aid such other person in the planning or commission of the offense." 720

ILCS 5/5-2(c) (2004).

Thus, where a defendant agrees or attempts to aid another person in the planning or commission of *an* offense, his liability attaches to any resulting offense, albeit one different from the planned and intended offense. Moreover, a defendant may be held accountable for armed robbery even where he asserts that he was unaware that his codefendant possessed a weapon. People v. Bartlett, 91 Ill. App. 3d 138, 141 (1980); People v. Crutcher, 72 Ill. App. 3d 239, 244 (1979); People v. Peters, 33 Ill. App. 3d 296, 299 (1975). Additionally, under the long-established common design rule, "where two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and are all equally responsible for the consequences of such further acts." Kessler, 57 Ill. 2d at 496-97.

At oral argument, the defense also maintained that in the absence of proof demonstrating a robbery was actually attempted inside the Family Dollar Store, the evidence was insufficient to establish the charged offense. However, in People v. Terrell, our supreme court recognized that one of the most troublesome problems in the area of inchoate offenses is " 'when preparation to commit an offense ceases and perpetration of the offense [attempt] begins.' " People v. Terrell, 99 Ill. 2d 427, 433 (1984), quoting Ill. Ann. Stat., ch. 38, par. 8–4(a), Committee Comments, at 512 (Smith-Hurd 1972). In Terrell, an anonymous call at 6:15 a.m. alerted the police that "two men, armed with guns were hiding behind a service station." Terrell, 99 Ill. 2d at 429. On arrival, the dispatched officers observed the defendant, crouched in the weeds 20 to 30 feet from the station,

jump up and run with a gun, which he dropped while scaling a nearby fence. Terrell, 99 Ill. 2d at 430. Rejecting defendant's explanation that he was going to the station to buy cigarettes, the court found this evidence sufficient to support his conviction for attempt armed robbery. Terrell, 99 Ill. 2d at 430, 436.

Furthermore, active participation has never been a requirement for criminal guilt on a theory of accountability. In the instant case, there was unequivocal evidence that defendant's group intended to commit a robbery at the Family Dollar Store. In furtherance of that intent, the State's evidence placed two members of the group inside the store, at least one of whom was armed with a loaded weapon. Clearly, the proofs sufficed to show a substantial step was taken toward the commission of the intended offense, rather than mere preparation. Had the State elected to submit a verdict form on this charged offense, we would have no difficulty in affirming any resulting conviction.

Defendant's next argument, however, has legal merit. Here again, the charging instrument is instructive. Count III, the felony murder charge, alleges that the named defendants:

"Committed the offense of first degree murder *** in that they, without lawful justification, shot and killed Marcell [*sic*] Hunt during the attempt of a forcible felony, to wit: armed robbery, in violation of Chapter 720 Act 5 Section 9-1(a)(3)."

Pursuant to this charge, the State was required to prove that one or more of the named defendants shot and killed Marcel Hunt and that the act occurred during the attempt to commit an armed robbery. Accordingly, the jury was instructed, pursuant to Illinois Pattern Instructions, No. 5.03 (accountability) and 7.02 (murder) (IPI Criminal 4th Nos. 5.03, 7.02), on the elements of felony

11

murder on a theory of accountability:

"To sustain the charge of first degree murder, the State must prove the following propositions:

First: That the defendant *or one for whose conduct he is legally responsible*, performed the acts which caused the death of Marcel Hunt; and

Second: That when the defendant, or one for whose conduct he is legally responsible, did so, he was attempting to commit the offense of armed robbery." (Emphasis added.).

Thus, the jury was required to find, *inter alia*, beyond a reasonable doubt, that the defendant "or one for whose conduct he is legally responsible," performed the acts which caused the death of Marcel Hunt. In addition, the trial judge instructed the jurors on the common design rule, providing:

"To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, Marcel Hunt.

It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit attempt armed robbery, *and that the deceased was killed by one of the parties committing that unlawful act*." (Emphasis added.) IPI Criminal 4th No. 5.03A.

Once more, the jurors were told that they must find beyond a reasonable doubt that the deceased met his fate at the hands of one of the parties attempting to commit the offense of armed robbery.

Notwithstanding the mandate of both instructions, the jurors could not plausibly find the

12

requisite element of causation by any of the alleged offenders had been proved beyond a reasonable doubt. Even viewing the evidence in a light most favorable to the State, as we must of course do, there is a total absence of evidence proving or even suggesting who caused Marcel Hunt's demise. Although there is clearly evidence placing two members of the group (Timothy Burton and Demario Bolden) inside the premises and putting a weapon in Bolden's possession, there simply is no evidence suggesting that the gun was the murder weapon or, for that matter, that any weapon was fired contemporaneously with the entry or presence of the defendant's group within the Family Dollar Store. No one testified that a gunshot was ever heard. Indeed, Officer Rogers, who was patrolling the immediate vicinity while the attempted robbery was occurring, affirmatively testified that he did not hear a gunshot. The proof is problematic and entirely lacking as to the missing link of causation.

Furthermore, although Officer Jackson could not find the markings he originally placed on the gun when it was inventoried, he insisted during trial that it was the same gun he had originally recovered. Witness testimony further indicates that there were various other individuals in the store at the time of the attempted offense. Simply put, we find precious little in the way of connecting facts to discuss here, which is precisely what we find to be problematic. It is not that there is conflicting evidence of the murder (which a trier of fact could resolve), but instead a complete lack of evidence. No physical evidence or testimony was offered to conclusively link any of the criminal confederates with the shooting death of Mr. Hunt or that one of them had even fired a gun on the day of the incident. Evidence consisting of Officer Rogers' testimony placing Demario Bolden and Burton at the Family Dollar with a gun that did not conclusively fire the

13

killing bullet, with nothing more, is patently insufficient to prove defendant accountable for the victim's murder beyond a reasonable doubt, even in light of the considerable deference we afford to a trier of fact.

The defense cites Fagan v. Washington, 942 F.2d 1155 (7th Cir. 1991), a Seventh Circuit Court of Appeals case which this court finds persuasive in its comprehensive discussion of Illinois' accountability statute under a similar fact pattern. In Fagan, the defendant was part of a group of gang members that assembled to attack a rival gang member. Evidence at trial conclusively showed that while shooting at the victim, defendant was armed with a .22-caliber rifle and that his codefendant was armed with a shotgun. The victim, however, was killed by a .38-caliber pistol that someone had pressed into his back before firing. The pistol was never found and the shooter was never identified. Defendant was originally convicted under an accountability theory but the conviction was vacated by the United States District Court on review of the defendant's *habeas corpus* petition. The Seventh Circuit affirmed the district court's decision, finding that "accountability requires proof that the defendant shared with the person who actually committed the crime for which the defendant is sought be held accountable a common design." Fagan, 942 F.2d at 1158. In applying that principle to the facts of the case, the court found that "[n]o evidence was presented that [defendant] shared a common design with whoever shot [Green]," and therefore his conviction was properly vacated. Fagan, 942 F.2d at 1159. We note that this court has since favorably relied upon the accountability principles discussed in Fagan in People v. Chirchirillo, 393 Ill. App. 3d 916 (2009) (conviction of unlawful possession of a weapon by a felon through accountability was reversed where evidence did not establish that codefendant was

14

in fact a convicted felon).

Here, defendant's cohorts were undisputedly inside the Family Dollar and they intended to rob the store. In Fagan, defendant was undisputedly at the scene of the murder. Here, the only physical evidence of the murder consisted of the bullet which killed Mr. Hunt, which did not match the recovered gun. In Fagan, the only physical evidence consisted of a bullet which did not match either defendant's gun. In both cases, there was no other evidence suggesting that the victim died as a result of the predicate offense and thus there was no evidence that defendant shared a common design with whoever shot the victim, leading to a fatal lack of proof of causation. The evidence at trial here only shows that defendant shared a common design with those that committed the attempted armed robbery, for which he could have been held accountable, but not the murder. Based on this evidence, we believe the trial court should have granted defendant's motion for directed verdict at the close of the State's case and taken the case from the jury. People v. Kelley, 338 Ill. App. 3d 273, 276-77 (2003), quoting 725 ILCS 5/115-4(k) (West 2000).

Although a trier of fact is afforded great deference, a conviction for a crime must nevertheless be a conviction beyond a reasonable doubt and a failure to meet this burden entitles a defendant to a finding of not guilty. This, obviously, is an analysis of the State's failure to meet its burden of proof, not of defendant's innocence. Our supreme court's discussion in People v. Smith, 185 Ill. 2d 532, 545-46 (1999), which we quote at length, explains with great insight and clarity the significance of this distinction:

"A not guilty verdict expresses no view as to a defendant's innocence. Rather, it indicates

15

simply that the prosecution has failed to meet its burden of proof. While there are those who may criticize courts for turning criminals loose, courts have a duty to ensure that all citizens receive those rights which are applicable equally to every citizen who may find himself charged with a crime, whatever the crime and whatever the circumstances. When the State cannot meet its burden of proof, the defendant must go free. This case happens to be a murder case carrying a sentence of death against a defendant where the State has failed to meet its burden. It is no help to speculate that the defendant may have killed the victim. No citizen would be safe from prosecution under such a standard."

This lofty language is surely cold comfort for Mr. Hunt's family, but this court is under an obligation to ensure that the State meets its burden in every case and especially in cases in which a life is lost. Any conclusion as to the identity of the person who killed Mr. Hunt, under the evidence that the State chose to put before this trial court and jury, would necessarily be the product of nothing more than rank speculation. And this is no frivolous technicality; it represents a fundamental failure in sustaining the required burden of proof on the most critical issue in the prosecution of this defendant for murder and it requires us to free him despite the evidence of his involvement in the underlying crime of robbery, for which he was not prosecuted. We therefore conclude that the evidence presented at trial fell short of what is required in an accountability case for felony murder, creating reasonable doubt as to defendant's guilt and we accordingly reverse on this issue.

Because we reverse on the sufficiency of the evidence, we decline to address defendant's remaining contentions regarding his excessive sentence and the motion to suppress his videotaped

statement.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Reversed.

TOOMIN, P.J., and HOWSE, J., concur.