2023 IL App (2d) 200673-U
No. 2-20-0673
Order filed October 20, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-2766 |
| CRAIG D. RICE, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's statutory speedy-trial rights were not violated, and the evidence was sufficient to convict him of retail theft of items valued in excess of $300. Therefore, we affirm.

¶ 2   Defendant, Craig D. Rice, appeals from his conviction of retail theft (720 ILCS 5/16-25(a)(1) (West 2018)). He raises two issues on appeal: (1) whether he was tried in violation of his statutory right to a speedy trial (725 ILCS 5/103-5 (West 2018)), and (2) whether the evidence was sufficient to convict him of retail theft of property exceeding a full retail value of $300. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On December 11, 2019, the State charged defendant by information with two counts of retail theft under section 16-25(a)(1) of the Criminal Code of 2012 (720 ILCS 5/16-25(a)(1) (West 2018)), in that, on or about December 3, 2019, defendant allegedly took possession of electronic merchandise from the Menards home improvement store located at 6401 Route 132 in Gurnee, Illinois,[1] with the intent of permanently depriving Menards of such merchandise and without paying for the merchandise.

¶ 5      On January 8, 2020, a grand jury returned a four-count indictment against defendant and his co-defendant, Kwana K. Nesbit. Count I alleged that defendant and Nesbit committed the offense of burglary (720 ILCS 5/19-1(a) (West 2018)) when they entered Menards without authority and with the intent to commit a theft therein. Count II alleged that defendant and Nesbit committed retail theft (720 ILCS 5/16-25(a)(1) (West 2018)) when they knowingly took possession of electronic merchandise for sale at Menards, which had a value exceeding $300, without paying for the merchandise and with the intent of permanently depriving Menards of the merchandise. Count III, which was directed only at defendant, alleged enhanced retail theft in that defendant committed the theft alleged in count II and had previously been convicted of theft in the circuit court of Lake County (No. 14-CF-1696). Count IV was directed only at Nesbit and is not at issue in this case.[2]

_____

[1]Further references to Menards in this disposition refer to the Menards located at this Gurnee address.

[2]Count IV alleged enhanced retail theft based on Nesbit's prior theft conviction in the circuit court of Lake County.

¶ 6                                    A. Pretrial Proceedings

¶ 7        Defendant moved for a substitution of judge on January 15, 2020. A new judge took over the case on January 30, 2020, and defendant was arraigned that same day. At the arraignment hearing, defendant was represented by Barry Boches as private counsel. Defendant pled not guilty to all counts, and he stated that "I want a speedy trial, [Y]our Honor." The trial court set defendant's trial for March 23, 2020.

¶ 8        The pretrial conference was held on March 13, 2020. Following the conference, defendant's trial date remained March 23, 2020. Through Boches, defendant requested a bench trial, and defendant signed a waiver of his right to a jury trial that same day.

¶ 9        Defendant's bench trial did not begin on March 23, 2020. On March 19, 2020, the trial court entered an order rescheduling defendant's trial to April 17, 2020.

¶ 10       Right around this time, the Illinois Supreme Court and the circuit court of Lake County entered orders related to the burgeoning COVID-19 pandemic. The first of such orders, entered on March 17, 2020, by the circuit court of Lake County, provided that, in light of the COVID-19 pandemic, all matters were to be rescheduled and continued for 28 days and employees were encouraged to work remotely. 19th Judicial Cir. Ct. Adm. Order 20-11 (eff. Mar. 17, 2020).

¶ 11       On April 4, 2020, defendant filed a *pro se* motion to dismiss based on a violation of his statutory right to a speedy trial.[3] Therein, he argued that more than 120 days had elapsed since he

_____

[3]Around this time, defendant's private attorney, Mr. Boches, went missing. According to the National Missing and Unidentified Person System's website, https://namus.nij.ojp.gov/case/ MP70683 (last visited Oct. 19, 2021) [https://perma.cc/JW3B-HFGQ], the date of last contact with Boches was March 24, 2020, and he is still reported missing.

his custody began on December 4, 2019, and that he had not caused, contributed, or acquiesced to the delay. He specifically contended that the trial court should not have continued his trial to April 17, 2020. He requested that he be discharged from custody and that all charges against him be dismissed. Defendant additionally filed a *pro se* motion on April 8, 2020, objecting to any and all continuances.

¶ 12    Defendant's trial did not begin on April 17, 2020. There is no record of proceeding to indicate why the trial date was continued, only a docket report sheet from April 17 stating that the bench trial was "stricken from call." The Court Reporting Services Supervisor for the 19th Circuit averred on August 19, 2021, that no court reporter had been present at the March 19, April 2, April 7, and May 4, 2020, hearings.

¶ 13    On April 27, 2020, defendant filed an appearance, therein stating that he was "fully prepared to proceed" as a *pro se* litigant. He requested that the court grant him a hearing on the next available court date.

¶ 14    On May 14, 2020, defendant appeared for a status before the trial court. Also present at court were an assistant public defender and an assistant State's Attorney. Defendant acknowledged that Boches would no longer be appearing on his behalf. The court suggested that it could appoint the assistant public defender who was already representing defendant on other matters to represent him on this matter. Defendant responded that it was in his "best interest" to represent himself in this case, explaining that he and his public defender were "in just two different places." Defendant requested that trial begin the next week, but the trial court informed him that, whether he had counsel or not, no trial would commence in the next week because the court was still under order from the chief judge to hold emergency operations only.

¶ 15    Defendant continued to request that he proceed *pro se* until the trial court informed him of his potential 14-year sentence on the burglary charge, after which he stated, "Well, Your Honor. Hold on, man. I was just thinking, right. *** I think I would like to talk [my counsel] first." The trial court thereafter appointed the public defender to represent defendant in this action.

¶ 16    At a case management conference on May 28, 2020, defendant again requested that he proceed *pro se*. He also requested that standby counsel be appointed. Although the trial court thought it was "not a great idea" to forgo counsel, it found that defendant was making a knowing and voluntary decision to waive his right to counsel. The trial court denied defendant's request for standby counsel. Thereafter, defendant requested that the court set a hearing for his motion to dismiss based on a statutory speedy trial violation, and the court set it for hearing.

¶ 17    On June 8, 2020, defendant filed an amended *pro se* motion to dismiss based on a statutory speedy-trial violation. Therein, he argued that he had been in custody since December 3, 2019, which started the speedy-trial statutory period, and that he had been in custody more than 120 days. Defendant stated that he had objected to continuances on January 15, 2020; January 30, 2020; and March 13, 2020. Defendant further argued that the trial court had erred on March 20, 2020, when it continued defendant's trial. He contended that, although the Illinois Supreme Court's administrative order dated April 7, 2020, temporarily suspended speedy trials, the relevant supreme court order in effect at the time of defendant's speedy trial violation, which he alleged occurred on April 1, did not permit the trial court to continue speedy trials.

¶ 18    The hearing on defendant's amended *pro se* motion to dismiss on a statutory speedy-trial violation commenced on June 11, 2020, via a Zoom video conference. Following arguments, the trial court made the following findings. Defendant was arrested by Waukegan police officers at 7:13 p.m. on December 3, 2019, but he was not charged with the relevant theft and burglary

offenses until December 11, 2019. His first appearance at bond hearing was the following day, although the court stated that "[p]erhaps he was taken into custody on December 11th." The court said it would start its count with December 11 "just to give the benefit of the doubt."

¶ 19    The trial court continued that defendant's original date for arraignment was January 15, 2020, and defendant exercised his statutory right to substitute judge. The substitution delayed defendant's arraignment until January 30, 2020, when his arraignment occurred. On March 12, 2020, defendant waived his right to a jury trial, and a bench trial was set for March 23, 2020. However, before the bench trial commenced, the COVID-19 pandemic "hit Illinois and the United States, and things got significantly derailed at that point."

¶ 20    The trial court found that from the time defendant was in custody on this case, which was either the night of December 11, 2019, or the following day, all time going forward was attributable to the State unless the court stated otherwise. The court found that the delay from January 15, 2020, until defendant's arraignment on January 30 was attributable to defendant. It did not find that any delay was attributable to defendant based on his decision to represent himself.

¶ 21    The trial court continued that, on March 20, 2020, the Illinois Supreme Court "issued the first of a series of orders that toll speedy trial for *** criminal cases in Illinois." The trial court highlighted the supreme court's final amended order at that time, which provided that continuances would be excluded from speedy trial computations. The trial court concluded that defendant's statutory speedy-trial right had not been violated, as it calculated that only 85 days (give or take a day) attributable to the State had elapsed since defendant was taken into custody on December 11, 2019.

¶ 22    After the trial court's ruling, defendant stated that he was ready for trial. Defendant also requested that the public defender represent him once again in this matter. The trial court

reappointed counsel, stating that defendant's desire for counsel was "a great idea." The trial court tentatively set trial for July 6, 2020, acknowledging the uncertainty in scheduling due to the pandemic.

¶ 23    On June 26, 2020, the parties answered ready for trial, and the trial court set July 6, 2020, for a bench trial. The parties preferred an in-person trial, and the plan was for an in-person trial, if possible. The court noted that "every ten days or so things seem to change," and thus the court would have to assess closer to the trial date whether a change to the trial date or manner would be necessary.

¶ 24    At a July 2, 2020, hearing via video conference, the trial court informed defendant that "[u]nfortuantley due to the COVID situation it's simply not possible for us to do the trial." The court proposed trial on August 17, 2020. Defense counsel informed the court that defendant had executed a waiver of his right to be physically present in the courtroom. Defendant was also consenting to have trial remotely via the Zoom videoconferencing application and objecting to a continuance on speedy-trial grounds. Defendant argued that, by waiving his right to be present, the speedy-trial term began to accrue again.

¶ 25    On July 7, 2020, the State filed a written response objecting to defendant's request for a Zoom bench trial. At a hearing that same day, the trial court ordered both sides to submit in writing what constitutional rights defendant would have to waive in order to have a video-conferenced bench trial.

¶ 26    Defendant, through counsel, filed a motion to dismiss on July 17, 2020, based on a violation of his statutory right to a speedy trial. He argued that the statutory speedy-trial term began to run on December 13, 2019, and 33 days elapsed between then and defendant's arraignment on January 15, 2020. Defendant conceded that the days between January 15 and January 30, 2020, were

properly attributable to him for filing a motion to substitute judge. Defendant continued that the delay from January 30 to April 17, 2020, was attributable to the State, totaling 111 days against his speedy-trial term since December 13, 2019. Finally, he argued that the 16 days from July 7 to July 23, 2020, were attributable to the State because a bench trial should have been held, either in-person or over Zoom, bringing the total days attributable over 120.

¶ 27    At a remote hearing on July 23, 2020, the trial court accepted defendant's consent to proceed with a bench trial via Zoom.

¶ 28    The trial court held another remote hearing on July 30, 2020, where it heard and denied defendant's motion to dismiss on a speedy-trial violation. The court explained its ruling as follows. For purposes of the speedy-trial period, the period from December 13, 2019, to January 15, 2020, which totaled 33 days, was not occasioned by defendant. Defendant's January 15, 2020, motion for a substitution of judge delayed proceedings until January 30, 2020, and that delay was occasioned by defendant. From January 30 to March 20, 2020, the court was not ascribing delay to defendant. As of March 20, the court tallied 83 days not occasioned by defendant.

¶ 29    The trial court continued that, around March 19, 2020, COVID-19 hit, "[t]he sky had fallen, and nobody knew what was going on, and dates were being continued." The Illinois Supreme Court issued its first of several COVID-related orders on March 20, which addressed, in part, the right to a speedy trial. The trial court noted that the supreme court and circuit court orders regarding speedy trials did not create new substantive law but instead were procedural in nature and thus could be applied retroactively.

¶ 30    The trial court rejected the argument that, as of May 20, 2020, defendant's speedy-trial term had run, offering two bases for why it had not. First, "it was impossible to conduct these proceedings at that time," as there were no facilities "in person or virtual to conduct anything

really[.] *** We barely had ZOOM [*sic*] for bond hearings, nevermind [*sic*], felony proceedings." The court's felony courtrooms were not open on "a quote unquote regular basis" even at the time of the current hearing. The court simply lacked facilities to conduct all manner of proceedings, and particularly a remote felony bench trial. The court later noted that, to the judge's knowledge, the circuit court of Lake County had not yet conducted a bench trial in a criminal case as of the date of the hearing. Second, the trial court highlighted Boches's absence. The court remarked that "sadly he has neither been seen nor heard from since March." Regardless of the reason for his absence, his failure to appear repeatedly in court constituted delay occasioned by defendant.

¶ 31    Next, the trial court found that defendant had made an effective waiver of the rights that he needed to waive to conduct a felony bench trial remotely on July 23, 2020, but not before that date. The court continued that defendant had not done anything following July 23, 2020, to cause delay for purposes of a speedy trial.

¶ 32    Although defendant had waived his rights necessary for a remote trial, the court was "not confident of the integrity of the judicial process by having [an] online bench trial in this felony case." The court was concerned about the issue of identification in the case, and it also was concerned that one of the attorneys in the case was currently quarantining, and quarantine could affect an attorney's ability to obtain and offer evidence. The court also noted that court facilities were "not just brick and mortar." They also included computer infrastructure to conduct a trial over Zoom. Thus, because the court did not see a way to begin defendant's trial, it found the speedy-trial term was tolled from July 23, 2020, to until July 30, 2020, and at least the next several days. The court set the case for an in-person trial beginning on August 17, 2020.

¶ 33     In sum, the trial court tallied 83 days not occasioned by defendant. It noted that August 17 would be within the statutory 120-day period, even if the court were to find that all days going forward were not attributable to defendant. As such, the motion to dismiss was denied.

¶ 34     Defendant's bench trial did not begin on August 17. Instead, the case was transferred to another judge, and the in-person bench trial commenced on August 18, 2020.

¶ 35                                    B. Bench Trial

¶ 36     The State's first witness was Katie Martinez, who testified as follows. She worked as a head cashier at Menards. On December 3, 2019, around 6 p.m., she was working at Menards behind the service desk, which spanned from the entrance door to exit door. She was at the desk nearest the exit door. While Martinez was assisting another customer, she was approached by a woman, and behind the woman was a man "carrying a large box fairly quickly." The man and woman exited the store, passing through register one, which had no cashier at the time.

¶ 37     Martinez followed them outside, and the woman moved directly in front of the vehicle, right in front of the license plate. When the woman eventually moved, Martinez was able to observe the license plate and write down the plate information. After the woman moved, the man got in the vehicle behind the driver's seat, and he yelled at the woman to get into the car. A third person was driving the vehicle. After the man and the woman left the Menards lot, Martinez went back inside and called the store manager to inform him that somebody had left the store without paying for merchandise.

¶ 38     Martinez identified defendant as the man carrying the box who walked through register one that day. She also identified People's Exhibit No. 1, which was security camera footage from Menards that day, and the exhibit was admitted without objection. The security footage contained only video, no audio. Around 6:20 p.m. that day, the footage showed Martinez at the Menards

service desk. In the footage, defendant and a woman pass Martinez, and Martinez follows them. Next, the footage cut to a view of the parking lot, showing defendant and the woman walking quickly away from the store. Shortly thereafter, Martinez appears in the frame, and the woman turns around and appears to say something to Martinez before exiting the frame. The footage ended with Martinez returning to the store.

¶ 39    On cross-examination, Martinez agreed that she did not see defendant or the woman enter the Menards, nor did she see them while they were inside the store. She did not follow them through the store or know where in the store they went.

¶ 40    Ryan Fritz testified next as follows. He had worked at Menards for 20 years, and he was the general manager of the Gurnee Menards. On December 3, 2019, around 6 p.m., he was working at Menards. Martinez alerted him to a theft that had occurred at the store. He immediately asked her if she had obtained a license plate number, and he stated that the protocol was to check the security cameras.

¶ 41    The Gurnee Menards was equipped with approximately 80 security cameras, although not all were functioning on that day. Fritz watched the available footage, located some footage of the alleged theft, and called the police. In the security footage, Fritz was able to observe a missing Swann security system, and People's Exhibit No. 3, depicting a Swann security system, was admitted without objection. In addition to reviewing the security footage, Fritz checked the store inventory by counting items on the shelves that are commonly stolen along with a Swann security system, and he discovered two Vivitar doorbell cameras and a Vivitar pan-and-tilt camera were also missing. People's Exhibit No. 4 was a photograph of the pan-and-tilt camera and two doorbell cameras, along with the Swann security system, that were missing from the inventory. The exhibit was admitted without objection.

¶ 42    Fritz testified that the Swann security system "[r]etails for about $280," the Vivitar doorbell cameras retailed for $70 apiece, and the Vivitar pan-and-tilt camera retailed at "right around $40." The total value of the four items was over $400. After he determined on December 3, 2019, that these four items were missing from the store, he generated an invoice for the items. People's Exhibit No. 5 was the invoice, and it listed a "pre-tax total" of $279.99 for the Swann security system and $179.97 for the three Vivitar items.

¶ 43    On cross-examination, Fritz agreed that the only item he could see in the security footage was the Swann security system, and he could not give the definitive time when the other items left the Menards. However, he explained that high-theft items like the missing Vivitar items were counted every three days, "so you can definitely have a good idea if something had been purchased or if it had been stolen in a certain time frame."

¶ 44    Waukegan Police Officer Enrique Cardenas testified as follows. On December 3, 2019, around 7 p.m., he was on patrol. While driving alone in his squad car, he observed a silver Honda Civic, which was related to a string of retail thefts in Lake County, parked by an automotive repair shop at the intersection of 10th Street and Jackson Street in Waukegan. He observed that the vehicle was occupied by a male and two females.

¶ 45    Cardenas looped around the block while waiting for backup. He parked his car behind the Honda Civic, activated his emergency lights, and contacted the driver of the vehicle. At that point, only one occupant remained in the Honda, who he believed was Tracey Young. When speaking with her, he observed a black male exiting the lobby entrance of the repair shop, and he identified the man as defendant. Defendant had several warrants out for his arrest. When Cardenas walked toward defendant, defendant began walking away. Cardenas followed, and defendant increased his

pace. Once defendant reached 10th Street, "he began sprinting westbound," in front of traffic. Cardenas chased, shouting "Police. Stop," but defendant continued to try to evade arrest.

¶ 46 A foot chase ensued, with defendant running into a clutter of trash, jumping over vehicles, and also jumping a fence. At some point, defendant lost his boots, which the police recovered. Cardenas eventually caught up to defendant and, using a "bear hug form," he "assisted him to the ground" and waited for other officers to arrive. Defendant was handcuffed, and Cardenas checked his person. Defendant had around $13 in cash and no credit cards on him. Defendant was taken into custody. Cardenas's body camera footage of the events of that day were admitted into evidence without objection as People's Exhibit No. 7, and the footage was played for the court.

¶ 47 Waukegan Police Officer Brian Maschek testified as follows. On December 3, 2019, around 7 p.m., he was directed to an automotive repair shop on Jackson Street near the intersection of 10th Street and Jackson Street. When he arrived at the shop, he observed a silver Honda Civic parked at the shop, and he approached the vehicle. He spoke with the driver of the vehicle, Tracey Young, and afterward, he walked to the entrance of the shop.

¶ 48 Inside the shop, in the waiting area, he saw Kawana Nesbit sitting in a chair. Nesbit was an individual he was looking for as a result of the information about the silver Honda Civic that he had obtained from officers in Gurnee. Maschek identified photos of Nesbit in the clothes she was wearing that day, which were admitted without objection as People's Exhibit Nos. 8 and 9. The security camera footage of the woman from Menards matched Nesbit's depiction in the photos identified by Maschek, including her clothing.

¶ 49 Underneath the chair to the left of Nesbit, Maschek observed a white plastic bag, and inside the bag were three Vivitar camera systems. In front of and to the right of Nesbit was a Swann

surveillance system. Maschek's body camera footage from the day was admitted without objection as People's Exhibit No. 13, and the video was played for the court.

¶ 50    The State rested, and defense counsel moved for a directed finding[4] with respect to the burglary charge. The trial court denied the motion, and the defense called no witnesses.

¶ 51    Following closing arguments, the trial court found defendant guilty of the two counts of retail theft but not guilty of the burglary count. The trial court specifically found that the value of the merchandise stolen was $460. The State informed the court that it was going to nol-pros defendant's other pending matters and seek to use them in aggravation at the sentencing on defendant's retail theft conviction.

¶ 52    In a posttrial motion, defense counsel argued that the trial court made erroneous findings in its denial of defendant's motion to dismiss based on speedy-trial grounds. The court denied the motion.

¶ 53    Following a sentencing hearing, the trial court sentenced defendant to an extended-term sentence of six years' imprisonment on the offense of retail theft (count II). Defendant timely appealed.

¶ 54                                    II. ANALYSIS

¶ 55    Defendant raises two issues on appeal: (1) whether his statutory speedy-trial rights under section 103-5 of the Criminal Code of 1963 (Code) (725 ILCS 5/103-5 (West 2018)) were violated

---

[4]Defendant's motion was labeled as a motion for a "directed verdict," but directed verdicts apply only to jury trials. See *People v. Connolly*, 322 Ill. App. 3d 905, 914 (2001); see also 735 ILCS 5/2-1110 (West 2018).

and (2) whether the evidence was sufficient to convict him of the offense of retail theft of merchandise exceeding a value of $300. We address these two issues in turn.

¶ 56                                A. Speedy Trial

¶ 57    Defendant argues that his conviction should be reversed because he was tried in violation of his statutory right to a speedy trial. He contends that he was not tried within 120 days of being taken into custody on December 12, 2019, excepting delays occasioned by him.

¶ 58    At the heart of defendant's argument are the Illinois Supreme Court's emergency administrative orders in response to the COVID-19 pandemic. He argues that the emergency orders did not toll the speedy-trial period, contending that the emergency orders constituted judicially created statutory exceptions to the statutory right to a speedy trial, which violated Article II, Section 1, of the Illinois Constitution of 1970 and the principle of the separation of powers. Thus, he argues that the Illinois Supreme Court lacked authority to issue orders tolling the speedy-trial period.

¶ 59    Defendant contends that 104 days from April 17 to July 30, 2020, were attributable to continuances by the trial court based on the supreme court's March and April emergency orders. He continues that, when combined with the 84 days that the trial court found were not occasioned by him, well more than 120 days had passed before his bench trial commenced on August 18, 2020. Defendant correctly states our standard of review: we review the trial court's determination as to who occasioned a delay in the trial for an abuse of discretion, and we review *de novo* the ultimate question of whether the defendant's statutory speedy-trial right was violated. *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 56.

¶ 60    We held defendant's appeal in abeyance, awaiting our supreme court's decision in *People v. Mayfield*, 2023 IL 128092, which addressed whether the supreme court's emergency

administrative orders in response to the COVID-19 pandemic violated the Illinois Constitution of 1970's separation-of-powers clause by infringing on the General Assembly's legislative authority. Based on our supreme court's decision in *Mayfield*, we reject defendant's arguments.

¶ 61    In *Mayfield*, the defendant was arrested on February 16, 2020, and remained in custody awaiting trial. *Id.* ¶ 5. On March 12, 2020, the defendant asked for the earliest available trial date, and the trial court scheduled his trial for April 27. *Id.* Before his trial began, the supreme court began entering a series of emergency administrative orders in response to the emerging threat of COVID-19. *Id.* ¶ 6. The first order, entered March 17, 2020, provided general guidelines for Illinois appellate and circuit court procedures. *Id.* (citing Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020)).

¶ 62    On March 20, 2020, the supreme court entered an emergency order authorizing chief judges of each circuit court to continue trials for 60 days and until further order of the court. *Id.* ¶ 7 (citing Ill. S. Ct., M.R. 30370 (eff. Mar. 20, 2020)). The order provided that in criminal proceedings, any delay resulting from the order was not attributable to the State or the defendant for purposes of section 103-5 of the Code (725 ILCS 5/103-5 (West 2018)). *Id.*

¶ 63    The supreme court amended the March 20 order on April 3. *Id.* ¶ 8. The amended order addressed juvenile delinquency proceedings in addition to criminal proceedings, providing that delays were not attributable to either the State or juvenile for purposes of section 5-601 of the Juvenile Court Act of 1987 (705 ILCS 405/5-601 (West 2018)). Ill. S. Ct., M.R. 30370 (eff. Apr. 3, 2020).

¶ 64    The supreme court again amended the March 20 order on April 7 "to clarify [its] intent to toll the time restrictions of the speedy-trial statute." *Mayfield*, 2023 IL 128092, ¶ 9. The order provided that "[t]he continuances occasioned by this Order serve the ends of justice and outweigh

the best interests of the public and defendants in a speedy trial. Therefore, such continuances shall be excluded from speedy trial computations contained in section 103-5 of the [Code] ***. Statutory time restrictions in section 103-5 *** shall be tolled until further order of the Court." Ill. S. Ct., M.R. 30370 (eff. Apr. 7, 2020).

¶ 65　The defendant moved to dismiss his case on speedy-trial grounds, and the circuit court denied the motion to dismiss. *Mayfield*, 2023 IL 128092, ¶ 14. The defendant was tried at an in-person bench trial on September 9, 2020, resulting in his conviction. *Id.* He renewed his speedy-trial challenge in a posttrial motion, and the trial court denied the motion. *Id.* The defendant appealed, and the appellate court rejected his claim that the supreme court lacked authority to suspend the speedy-trial term. *Id.* ¶ 15.

¶ 66　Before the supreme court, the State did not dispute that the defendant was not tried within the statutory speedy-trial term, and the defendant did not dispute that he was tried in accordance with the procedure set forth in the supreme court's emergency orders. *Id.* ¶ 22. Thus, whether defendant was tried timely turned on "whether the emergency administrative orders were valid." *Id.* The defendant argued that, because the administrative orders conflicted with the legislatively enacted speedy-trial statute, the orders violated the separation-of-powers doctrine. *Id.* ¶ 23.

¶ 67　The supreme court held that its emergency administrative orders, which tolled the speedy-trial statue, did not violate the separation-of-powers clause of the Illinois Constitution of 1970. *Id.* ¶ 3. It explained that the supreme court's emergency administrative orders invoked article VI, section 16, of the Illinois Constitution, which provides that "[g]eneral administrative and supervisory authority over all courts is vested in the Supreme Court and shall be exercised by the Chief Justice in accordance with its rules." (Internal quotation marks omitted.) *Id.* ¶ 28 (quoting Ill. Const. 1970, art. VI, § 16). Furthermore, "the Chief Judge shall have general administrative

authority over his court, including authority to provide \*\*\* for appropriate times and places of holding court." (Internal quotation marks omitted.) *Id.* ¶ 28 (quoting Ill. Const. 1970, art. VI, § 7). In accordance with its supervisory authority, the supreme court stated that " '[w]here matters of judicial procedure are at issue, the constitutional authority to promulgate procedural rules can be concurrent between the court and the legislature.' " *Id.* ¶ 30 (quoting *Kunkel v. Walton*, 179 Ill. 2d 519, 528 (1997)).

¶ 68 The supreme court continued that when a statute conflicts with a court rule, the court will, if possible, reconcile the legislation with the judicial rule. *Id.* If it is not possible to reconcile the statute with a judicial rule adopted pursuant to the court's constitutional authority, the judicial rule will prevail. *Id.* ¶ 31. The supreme court explained that it retains primary constitutional authority over court procedure, and the legislature violates the separate of powers when an enactment " 'unduly encroaches upon the inherent powers of the judiciary, or directly or irreconcilably conflicts with a rule of this court on a matter within the court's authority.' " *Id.* (quoting *Kunkel*, 179 Ill. 2d at 528 (1997)).

¶ 69 In the defendant's case, it was not possible to reconcile the statute and the rule. *Id.* Therefore, the court rule prevailed, and the supreme court therefore affirmed the appellate court and circuit court judgments. *Id.* ¶ 41.

¶ 70 The supreme court's decision in *Mayfield* squarely controls this case. Under the holding in *Mayfield*, the supreme court's emergency administrative orders permitted the circuit courts to continue criminal trials, and any resulting delays were to be excluded from speedy-trial computations under section 103-5 of the Code (725 ILCS 5/103-5 (West 2018)). On April 6, 2020, pursuant to the supreme court's emergency administrative order M.R. 30370, the chief judge of the circuit court of Lake County continued "all matters \*\*\* scheduled prior to May 18, 2020," and

gave individual judges discretion on resetting court dates. 19th Judicial Cir. Ct. Adm. Order 20-23 (eff. Apr. 6, 2020). A subsequent order on May 22, 2020, provided that all trials in the criminal division would be continued until further order, stating that continuances would be excluded from speedy-trial computations and incorporating the language of the supreme court's April 7, 2020, emergency administrative order. 19th Judicial Cir. Ct. Adm. Order 20-31 (eff. May 22, 2020).

¶ 71 Consistent with these orders, we reject defendant's argument that the 104 days between April 17 and July 30, 2020, should have counted against his speedy-trial term. Before and during that period of time, the supreme court's valid emergency administrative orders tolling the speedy-trial statute were in effect, and the circuit court of Lake County had, as of April 6, 2020, continued all matters scheduled prior to May 18, 2020, consistent with the supreme court's orders. Defendant's trial, which had been scheduled for April 17, 2020, was clearly encompassed by the circuit court order. Without the 104 days between April 17 and July 30, 2020, defendant argues that only 84 days of his speedy-trial term had elapsed. Accordingly, we hold that his speedy-trial right was not violated.[5]

---

[5]Defendant does not argue whether the period between March 20 and April 17, 2020, should count against his speedy-trial term, but even assuming *arguendo* that some or all of it did, the total time counting against his speedy-trial term would still be under 120 days. Assuming defendant's custody began on December 11, 2019, which was the earliest day the trial court considered defendant in custody from among the various hearings on defendant's speedy-trial challenges, his speedy-trial count would have been at most 113 days on April 17, 2020, based on the two relevant time periods of December 11, 2019, to January 15, 2020, and January 30, 2020, to April 17, 2020. In calculating the time of each period, we have excluded the first day and

¶ 72                                    B. Sufficiency of the Evidence

¶ 73    Defendant also argues that the evidence was insufficient to support his conviction of retail theft. He argues that the State failed to prove that the merchandise stolen had a retail value exceeding $300 because it failed to present sufficient evidence linking the three Vivitar cameras to Menards. He emphasizes that the security camera footage showed only one item being removed, the Swann security system, which retailed for around $280. He argues that the evidence supported only that the other three cameras went missing, and even if they were stolen on December 3, 2019, there was no evidence of who stole them.

¶ 74    In support, defendant cites *People v. Liner*, 221 Ill. App. 3d 578, 578-80 (1991), where the appellate court reversed the defendant's conviction because the evidence was insufficient to prove that the Walgreens store was missing the allegedly stolen merchandise or that the recovered item came from the Walgreens. Defendant also cites *People v. Garrett*, 401 Ill. App. 3d 238 , 239 (2010), where the appellate court found the evidence insufficient to prove whether any of the robbers caused the shooting death of the victim inside the store they were robbing.

¶ 75    Defendant concedes that the State proved that he had a prior theft conviction, as alleged in count III for enhanced retail theft. Therefore, defendant requests that, should we reverse his conviction for a Class 3 felony on count II, we remand for sentencing on count III, a Class 4 felony.

¶ 76    The State responds that it proved defendant guilty of retail theft beyond a reasonable doubt, highlighting that defendant was captured on security camera footage walking out of Menards with the stolen Swann security system. The State continues that Fritz testified that three Vivitar cameras were missing from the area near where the Swann security system was stolen on December 3,

_____

included the last day. *People v. Pettis*, 2017 IL App (4th) 151006, ¶ 20.

2019, and Officer Maschek discovered these items along with the Swann security system next to co-defendant Nesbit at the automotive repair shop that same evening. The State concludes that the only plausible inference from the evidence is that Nesbit and defendant stole the three Vivitar cameras at the same time as they stole the Swann security system.

¶ 77     On a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimonies, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 78     "[A] conviction may be based solely on circumstantial evidence." *People v. Patterson*, 217 Ill. 2d 407, 435 (2005). Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish the guilt or innocence of a defendant. *People v. Harris*, 2023 IL App (1st) 210754, ¶ 77. In reviewing whether circumstantial evidence is sufficient to sustain a criminal conviction, "[i]t is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 79     A person commits retail theft when, among other ways, they carry away merchandise offered for sale in a retail mercantile establishment with the intention of retaining such

merchandise or depriving the merchant permanently of possession without paying full retail value of such merchandise. 720 ILCS 5/16-25(a)(1) (West 2018). When the full retail value of the property exceeds $300, the offense is a Class 3 felony. *Id.* § 16-25(f)(3).

¶ 80     We hold that the evidence was sufficient to convict defendant of count II for retail theft of merchandise exceeding a value of $300. Defendant does not dispute the theft of the Swann security system valued at $280. Instead, he challenges only the State's evidence that he stole the three Vivitar cameras.

¶ 81     Here, the circumstantial evidence was sufficient to establish that defendant and Nesbit stole the three Vivitar cameras along with the Swann security system. The three Vivitar cameras (two doorbell cameras and one pan-and-tilt camera) were discovered missing from Menards in the immediate aftermath of defendant's theft of the Swann security system. Per Fritz's testimony, that left at most a three-day window for the items to have gone missing. The Vivitar cameras had been located near the Swann security system within the Menards, and Fritz's inventory count of the Vivitar cameras had been triggered precisely because they were items commonly stolen along with a Swann security system. Moreover, police recovered the three Vivitar cameras along with the Swann Security system immediately next to Nesbit at the automotive repair shop within approximately an hour of the theft. The Menards security camera footage showed a woman matching Nesbit's description wearing a backpack and exiting Menards with defendant. Defendant was present at the automotive repair shop with Nesbit and the items, and he fled from the police when he saw them approach the shop.

¶ 82     Defendant's caselaw is unpersuasive. In *Liner*, the court reversed the defendant's conviction of retail theft for stealing merchandise from a Walgreens. *Liner*, 221 Ill. App. 3d at 580. The court held that the State had failed to prove the element of retail theft that the merchandise

allegedly stolen was displayed, held, stored, or offered for sale in a retail mercantile establishment. *Id.* It reasoned that no person from Walgreens testified that any merchandise was missing or that the defendant or his codefendant were seen leaving the Walgreens with merchandise. *Id.* Although an officer saw the codefendant throw a bottle of whiskey while being chased, the State "did not offer any evidence to connect that particular bottle to the Walgreens store." *Id.* The court believed that "something more was required" to connect the whiskey bottle to the Walgreens. *Id.*

¶ 83    In contrast to the facts of *Liner*, the State here did offer something more: It offered Fritz's testimony that three Vivitar cameras were recently missing from the same area of the store as the Swann security system, which the security footage showed defendant carrying from the store. These Vivitar cameras were items commonly stolen along with a Swann security system, and they were recovered next to Nesbit along with the Swann security camera on the same night as the alleged theft.

¶ 84    Likewise, this case offered something more than the facts in *Garrett*, 401 Ill. App. 3d at 247, where the court held that the evidence was insufficient to show that any of the codefendants caused the shooting death of a man in a Family Dollar Store. In *Garrett*, there was no evidence, physical or otherwise, to link any of the codefendants to the victim's shooting death, or any evidence that any of them even fired a gun on the day of the shooting. *Id.* The State offered only that the codefendants were present at the store with a gun. *Id.* In contrast again, the State here offered evidence that the three Vivitar cameras, which were located near the Swann security system in the Menards, went missing around the same time defendant stole the Swann security system, and the Vivitar cameras were recovered from Nesbit along with the Swann security system soon after the theft.

¶ 85     In sum, it was reasonable for the court to find that the three Vivitar cameras recovered next to Nesbit at the automotive repair shop were the same cameras missing from Menards and that defendant and Nesbit stole those cameras in addition to stealing the Swann security system. As the evidence reasonably established that the Swann security system retailed at $280 and the three Vivitar cameras at a total of $180, the evidence was sufficient to establish that the value of the merchandise stolen was over $300.

¶ 86                              III. CONCLUSION

¶ 87     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 88     Affirmed.